# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RONALD PANNELL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 1:20-cv-518 (CKK/GMH)** |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Defendant.** ) | |

## MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Plaintiff Ronald Pannell brings this case against the United States under the Federal Tort Claims Act, alleging that Deputy U.S. Marshals assaulted and battered him while effecting his arrest on the night of December 30, 2013. This case is before the undersigned on the United States' Motion for Summary Judgment.[1] The United States argues that undisputed facts in the record show that the deputies used reasonable force to effect Pannell's arrest. Pannell argues that genuine issues of material fact exist as to whether the deputies used reasonable force—specifically, whether they used force against Pannell after he was subdued. Upon consideration of the briefing[2] and relevant case law, the undersigned recommends that the Court deny Defendant's Motion for Summary Judgment because whether Pannell was subdued or was actively resisting arrest at the time the deputies used force against him is a material fact in dispute.

---

[1] This motion was referred to the undersigned for a Report and Recommendation on July 30, 2024, pursuant to Local Civil Rule 72.3(a)–(b). *See* ECF No. 44; LCvR 72.3(a)–(b).

[2] The relevant docket entries for the purpose of this Report and Recommendation are: (1) Defendant's Motion for Summary Judgment, Statement of Material Facts, and accompanying exhibits, ECF No. 40–40-2; (2) Plaintiff's Opposition to Defendant's Motion for Summary Judgment, response to Statement of Material Facts, and accompanying exhibits, ECF No. 41–41-6; and (3) Defendant's Reply to Plaintiff's opposition, ECF No. 43. The page numbers cited herein are those assigned by the Court's CM/ECF system.

# I.    BACKGROUND

## A.    Facts[3]

On the night of December 30, 2013, Plaintiff Ronald Pannell left a friend's apartment in Northeast Washington D.C. to meet up with his girlfriend, Wolanda Smith.  *See* ECF No. 40-1, ¶¶ 9–10; ECF No. 41-3, ¶¶ 9–10; ECF No. 41-4 at 4–6.  Smith pulled up in a white Yukon Denali to the corner of L Street and 19th Street NE and Pannell got into the passenger side of the vehicle. *See* ECF No. 40-1, ¶ 10; ECF No. 41-3, ¶ 10; ECF No. 41-4 at 6.  Smith informed Pannell that police were looking for him.  ECF No. 40-1, ¶ 9; ECF No. 41-3, ¶ 9.  While Pannell and Smith were sitting in the Yukon, six Deputy U.S. Marshals ("Deputy" or "deputies") arrived at the scene to execute a warrant against Pannell for assault with a deadly weapon (gun).  ECF No. 40-1, ¶¶ 1,

---

[3] Unless otherwise noted, the following factual allegations are undisputed (or should be deemed undisputed), either because they appear in the record without contradiction from other evidence, or because they appear in the Defendant's statement of undisputed material facts and have not been properly controverted by Plaintiff.  Additionally, pursuant to the doctrine of judicial estoppel, the undersigned recommends deeming uncontroverted facts Plaintiff admitted when he entered a guilty plea in connection with the charges stemming from the arrest at issue here.  *See* ECF No. 40-2 at 7–9 (Pannell's factual proffer in *United States v. Jenkins*, Case No. 14-cr-3).  "Judicial estoppel bars a party from taking a certain legal position in one proceeding and later, 'simply because his interests have changed, assum[ing] a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'" *Jenkins v. District of Columbia*, 4 F. Supp. 3d 137, 143 (D.D.C. 2013) (alteration in original) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)).  In determining whether to invoke judicial estoppel, a court will generally consider (1) whether "a party's later position [is] . . . clearly inconsistent with its earlier position;" (2) "whether the party has succeeded in persuading a court to accept the party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* (alterations in original) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).  As recognized in *Jenkins*, "the application of the doctrine of judicial estoppel . . . to preclude the relitigation of facts admitted in a Rule 11 proceeding is not settled law in this jurisdiction." *Id.*  But the D.C. Circuit has clarified that preclusion is "appropriate" when it is sought against the same adversary in the first trial. *Otherson v. Dep't of Just., I.N.S.*, 711 F.2d 267, 277 (D.C. Cir. 1983) (finding preclusion appropriate when "sought here by [the plaintiff's] adversary in the first trial, the federal government").  "[R]elitigation between the same two adversaries is more strikingly wasteful than relitigation between two different parties and . . . parties can most readily foresee, and expect to be subject to issue preclusion in, future suits involving a present adversary."  *Id.*  As the Fourth Circuit similarly—albeit more forcefully—noted, "[p]articularly galling is the situation where a criminal convicted on his own guilty plea seeks as a plaintiff in a subsequent civil action to claim redress based on a repudiation of the confession.  The effrontery or, as some might say it, chutzpah, is too much to take.  There certainly should be an estoppel in such a case." *Lowery v. Stovall*, 92 F.3d 219, 225 (4th Cir. 1996) (quoting Geoffrey Hazard, *Revisiting the Second Restatement of Judgments: Issue Preclusion and Related Problems*, 66 Cornell L. Rev. 564, 578 (1981)).  Accordingly, the undersigned recommends the Court preclude Plaintiff from contradicting facts he proffered in his plea agreement.

3, 10, 11; ECF No. 41-3, ¶¶ 1, 3, 10, 11.  As a part of the pre-arrest plan, the deputies were briefed on the underlying assault charge, and were informed that Pannell might be armed because the gun used in the assault had not been recovered and that he had a history of fleeing arrest and assaulting law enforcement.  ECF No. 40-1, ¶¶ 4–8; ECF No. 41-3, ¶¶ 4–8.

To execute the arrest warrant, the deputies used unmarked government vehicles to surround the Yukon.  ECF No. 40-1, ¶ 11; ECF No. 41-3, ¶ 11.  Around 10:40 p.m., the deputies converged on the Yukon and activated their vehicles' lights.[4]  ECF No. 40-2 at 8.  Deputy Shindledecker, who was riding as a passenger in the vehicle that blocked the Yukon from behind, exited his vehicle to cover the sidewalk on the passenger side of the Yukon.  ECF No. 40-1, ¶¶ 12, 14; ECF No. 41-3, ¶¶ 12, 14.  Pannell exited the passenger side of the Yukon and began running in the direction of L Street.  ECF No. 40-1, ¶ 17; ECF No. 41-3, ¶ 17; ECF No. 41-4 at 10.  While running, Pannell made contact with Deputy Shindledecker, who fell to the ground and suffered minor injuries to his hands and right knee.[5]  ECF No. 40-1, ¶¶ 19–20; ECF No. 41-3, ¶¶ 19–20; ECF No. 40-2 at 8.

---

[4] Pannell disputes that the vehicles' lights were activated.  *See* ECF No. 41-1 at 4–5 ("The Black vehicle [in front of the Yukon] did not have emergency lights activated. . . .  Pannell did not see any emergency lights on the vehicle behind the . . . Yukon . . . either."); ECF No. 41-4 at 9–10 (Pannell testifying at his deposition that he "didn't see any lights or anything" and that it was "not true" that the vehicles approached with lights on).  But this contradicts Pannell's factual proffer in his prior guilty plea, *see* ECF No. 40-2 at 8 (attesting to the fact that "the deputies surrounded the vehicle and activated their police lights"), and as such the Court should find that it is not genuinely contested.

In any event, the undersigned finds that the fact is not material.  Whether the deputies activated the police lights on their vehicles when they arrived on the scene is immaterial to the use of force analysis because Pannell admits that, by the time the deputies used any force against him, he was aware that the deputies were law enforcement, and admits that he was actively attempting to flee arrest.  *See* ECF No. 41-4 at 18 (Pannell testifying that when he came up the basement steps, he saw lights and "felt as though it was some type of law enforcement"); *id.* at 19 (Pannell testifying that he fled the basement steps "[b]ecause [he] was still scared and didn't want to go to jail").

[5] Pannell disputes this fact arguing that he did not "run directly into Shindledecker" but instead "pulled away from Shindledecker who attempted to grab [him] and Mr. Pannell brushed him with his shoulder."  ECF No. 40-1, ¶ 18.  Pannell's factual proffer in support of his guilty plea states that he "fled the front passenger seat of the vehicle and ran on the sidewalk where he made physical contact [with] DUSM John Shindledecker . . . causing Shindledecker to fall to the ground."  ECF No. 40-2 at 8.  Further, the factual proffer states that "[this] act[] . . . [was] done willfully and knowingly."  *Id.* at 9.  Further, Pannell disputes only the manner in which he made contact with Deputy Shindledecker, *i.e.*, the details of the contact, and not whether the contact occurred.  *See* ECF No. 41-3, ¶ 18; *see also* ECF No. 41-4 at 1–12 (Pannell testifying that he "brushed up against" Shindledecker and "may" have "made contact" with his "shoulder").  As such, the undersigned recommends the Court find this fact is not genuinely disputed.

Pannell continued to run westbound on L Street away from the deputies. ECF No. 40-1, ¶ 21; ECF No. 41-3, ¶ 21. The deputies identified themselves as police and yelled at him to stop fleeing.[6] ECF No. 40-2 at 8. Pannell testified that did not hear the deputies identify themselves as law enforcement or tell him to stop fleeing. ECF No. 41-4 at 13–14. At the end of the block, Pannell made a right on 17th Street, ran into an alley, and then hid in the basement stairwell of a residence. ECF No. 40-1, ¶¶ 23–25; ECF No. 41-3, ¶¶ 23–25.

Deputy Messinger located Pannell in the basement stairwell and was quickly joined by Deputy Hale. ECF No. 40-1, ¶¶ 26, 32; ECF No. 41-3, ¶¶ 26, 32. Pannell, again, began to flee and a physical struggle ensued between him and the deputies, eventually resulting in Pannell's arrest. ECF No. 40-1, ¶¶ 33–36; ECF No. 41-1, ¶¶ 33–36. From this point forward, the parties dispute the exact sequence of events.

Pannell testified that, after hiding in the basement stairwell for "a couple of minutes," he saw "some lights" and could "hear . . . footsteps getting closer [to him]." ECF No. 41-4 at 17. He then ran out of the basement stairwell and past two individuals who yelled at him to "stop." *Id.* at 17–18. Pannell continued to run but was tased in the back and he fell to the ground. *Id.* at 20 ("I felt something hit me in the back. That's when I went down to the ground."); *see also* ECF No. 41-1, ¶ 34–35; ECF No. 41-3, ¶ 34–35. Pannell maintains that he did not get up from the ground after the first Taser was deployed. *See* ECF No. 41-4 at 23 (Pannell testifying that it was "[n]ot true" that he tried to get back up after he fell and that he "couldn't move"). After he fell, Pannell states that multiple officers started jumping on him, punching and kicking him, and put one

---

[6] Pannell disputes this fact by arguing he "did not hear anyone giving verbal commands to stop," ECF No. 41-3, ¶ 22, and points to his deposition testimony as evidence, *see* ECF No. 41-4 at 13–14. These are two distinct factual disputes—whether the deputies verbalized that Pannell should stop fleeing and whether he heard them. As to the former, Pannell's factual proffer in the prior guilty plea stated: "During the pursuit, the marshals gave the defendant repeated verbal commands to stop fleeing." ECF No. 40-2 at 8. As such, the undersigned recommends the Court find it not genuinely contested that the deputies told him to stop.

handcuff on his right hand. *Id.* at 20–21. He acknowledges that the deputies were "constantly telling [him] to put [his other] hand behind [his] back" but that he could not comply because of the way the deputies were pinning him on the ground. *Id.* at 20. He asserts that he was lying on his stomach on the ground, the deputies were in control of his right hand, his left arm was outstretched in front of him, and the deputies had their knees on his back. *Id.* at 20, 23–24. Pannell states this went on for five to seven minutes until one of the deputies deployed a second Taser and Pannell's left hand was finally placed in handcuffs. *Id.* at 20, 29. Pannell asserts that, even after placing him in handcuffs, the deputies continued to punch and kick his body and face. ECF No. 41-5 at 3 ("I was placed in handcuffs after which I was again struck in my face, ribs[,] and back."); ECF No. 40-2 at 33 (Pannell testifying that after he felt the shock "my arm came back and they put me in cuffs. I was still being punched").

In contrast, Defendant states that that when Deputy Messinger found Pannell at the bottom of the stairs, he identified himself as law enforcement and issued commands for Pannell to come out and place his hands behind his back for arrest. ECF No. 40-2 at 43–44, 96–97, 106. Instead, Pannell walked up the stairs facing Deputy Messinger with his hands above his head. *Id.* at 44; 97. Deputy Messinger attempted to grab one of Pannell's hands, but Pannell pulled away and clenched his hands into fists, and Deputy Messinger then struck Pannell once in the face with a closed fist to effect arrest. *Id.* at 97–98. Then, Pannell ran past Deputies Messinger and Hale and Deputy Messinger deployed the first Taser, hitting Pannell in the back. *Id.* at 45, 99. Pannell fell but quickly rose to his feet and began to flee again. *Id.* at 99–100. Then, Deputies Messinger and Hale started to wrestle with Pannell to bring him to the ground, as Pannell continued to resist arrest and ignore the deputies' commands. *Id.* at 46, 101–02. At that point, two other deputies, Deputies Shindledecker and Ward, joined Deputies Messinger and Hale and finally brought Pannell to the

ground. *Id.* at 46, 69–70, 121–22. On the ground, the deputies struggled to gain control of Pannell's arms and struck him multiple times to subdue him and to attempt to handcuff him. *Id.* at 49 (Hale testifying he struck Pannell's "body area" multiple times), 72–73 (Shindledecker testifying that he struck Pannell "three to four times" and "believe[d] [Messinger] also attempted strikes"), 123 (Ward testifying that he struck Pannell twice in the stomach during this struggle). At some point, the deputies were able to place one cuff on Pannell. *Id.* at 72. Pannell, while lying face down on the ground, moved his hands under his stomach to further resist arrest. *Id.* Then, Deputy Ward deployed the second Taser, and the deputies were able to complete arrest. *Id.* at 124–25. Multiple deputies testified that none struck or kicked Pannell after he was placed in handcuffs. *See, e.g.*, *id.* at 102 (Messinger testifying "No. Not that I remember," when asked whether any deputies struck Pannell after he was handcuffed), 129–30 (Ward testifying that "[n]o one struck [Pannell] after he was restrained").

As a result of the incident, Pannell sustained a fractured cornea, kidney pain, testicular pain, blurred vision, elevated blood pressure, and back pain. *See* ECF No. 41-4 at 33–34.[7] Pannell alleges that he was hospitalized for these injuries for approximately one week. *See id.* at 33.[8]

### B.    Procedural History

On February 21, 2020, Plaintiff filed his complaint against the deputies for damages pursuant to *Bivens* and against the United States for damages pursuant to the Federal Tort Claims Act

---

[7] Defendant does not dispute these injuries, but rather argues that Plaintiff cannot tie these injuries to any alleged use of excessive force—as discussed below, this argument is unavailing because it relies on expert testimony to contest Plaintiff's theory of causation but does not contest the underlying injury. *See* Part III.B, *supra*; *see also* Part III.B at 23 n.11 (discussing Defendants argument regarding Plaintiff's fractured cornea). Whether the expert testimony should be believed over Plaintiff's evidence as to the extent of his injuries and their cause is a factual issue that should be resolved by the jury. *See Barnett*, 715 F.3d at 358.

[8] This fact is not disputed by Defendant. *See generally* ECF No. 40; ECF No. 43.

("FTCA") for assault and battery.  *See* ECF No. 1.  The Court dismissed the *Bivens* claims against the individual Defendants, *see* ECF No. 19, so only the FTCA claim remains.

       The case is before the undersigned on the United States' motion for summary judgment. ECF No. 40.  The United States argues that summary judgment should be granted because undisputed facts in the record show that the deputies used reasonable force to effect Pannell's arrest.  *Id.* at 6.  It argues that the record is clear that Pannell resisted arrest by fleeing and engaging in physical resistance, pointing to the fact that Pannell later pleaded guilty to the charge of Assaulting, Resisting, or Impeding Certain Officers or Employees, 18 U.S.C. § 111(a)(1), for his use of physical force against Deputy Shindledecker on the night in question.  *Id.*; *see also* ECF No. 40-2 at 7–9. As such, deputies "were compelled to use force to secure his arrest."  ECF No. 40 at 6.  Based on the *Graham* factors, *see Graham v. Connor*, 490 U.S. 386, 396 (1989), the United States argues the force used by the deputies was reasonable.  ECF No. 40 at 12–18.  It supports its motion with evidence in the record including deposition testimony from Pannell and five of the deputies who were present during his arrest; Use of Force Reports filed by the deputies shortly after the incident; Pannell's arrest warrant; Pannell's plea agreement and statement of offense in support of his guilty plea in *United States v. Jenkins*, Case No. 14-cr-3; the expert witness report of Paul D. Massock; and policy statements from the Department of Justice and the United States Marshal Service on the use of less-than-lethal force.  *See* ECF No. 40-2.

       Pannell opposes the summary judgment motion arguing that genuine issues of material fact exist as to whether the deputies used reasonable force.  ECF No. 41-1.  Specifically, Pannell argues that whether the deputies continued to strike Pannell after he was on the ground, handcuffed, and subdued is contested and material to the outcome of the case.  *Id.* at 9–11.  Pannell does not argue that the deputies used excessive force prior to the time he was subdued.  *See id.*  As such, the Court

must determine whether there are facts at issue as to the time Pannell ceased resisting arrest and was subdued, and whether deputies continued to use force against Pannell after that time.

## II.    LEGAL STANDARDS

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Initially, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met this burden, the non-moving party must "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting former Fed. R. Civ. P. 56(e)). To establish that a fact is or is not genuinely disputed, a party must (a) cite specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). While the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor, *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position; instead, "there must be evidence on which the jury could reasonably find" for the non-moving party, *Anderson*, 477 U.S. at 252. Moreover, the non-moving party "'may not rest upon mere allegation or

denials of his pleadings' but must present 'affirmative evidence' showing a genuine issue for trial."
*Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at
256–57); *Ass'n of Flight Attendants–CWA, AFL–CIO v. Dep't of Transp.*, 564 F.3d 462, 466 (D.C.
Cir. 2009) (conclusory assertions without support from record evidence cannot create a genuine
dispute).

A court's role in deciding a summary judgment motion is not to "determine the truth of the
matter, but instead [to] decide only whether there is a genuine dispute for trial."  *Barnett v. PA
Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting *Pardo-Kronemann v. Donovan*,
601 F.3d 599, 604 (D.C. Cir. 2010)).  It is well-established that "[c]redibility determinations, the
weighing of the evidence, and the drawing of legitimate inferences from the facts are jury func-
tions, not those of a judge at summary judgment."  *Id.* (quoting *Pardo-Kronemann*, 601 F.3d at
604).

## III.    DISCUSSION

The Federal Tort Claims Act ("FTCA") provides for the payment of claims that arise from
the negligent or wrongful acts or omissions of employees of the federal government while acting
within the scope of their employment.  28 U.S.C. §§ 1346(b), 2401(b), 2671, *et seq*.  This includes
intentional torts, such as assault and battery, attributable to law enforcement officers who are em-
ployees of the federal government.  *See* 28 U.S.C. 2680(h).

"Tort liability under the FTCA is determined according to the law of the place where the
alleged acts or omissions occurred."  *Harris v. Dep't of Veterans Affairs*, 776 F.3d 907, 911 (D.C.
Cir. 2015).  It is uncontested that Pannell's arrest and the facts underlying the assault and battery
allegations occurred in the District of Columbia.  *See* ECF No. 40-1, ¶ 10; ECF No. 41-3, ¶ 10.  In
the District of Columbia, assault is defined as "an intentional and unlawful attempt or threat, either

by words or by acts, to do physical harm to the victim." *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007) (quoting *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993). Battery is defined as "an intentional act that causes a harmful or offensive bodily contact." *Id*. (quoting *Etheredge*, 635 A.2d at 916). That said, "[t]he police have a qualified privilege to commit both torts when using 'reasonable force to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary.'" *Harris*, 776 F.3d at 913 (quoting *Arrington v. United States*, 473 F.3d 329, 335 (D.C. Cir. 2006)). In deciding whether an officer's use of force was "reasonable," a court must consider various *Graham* factors including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Armbruster v. Frost*, 962 F. Supp. 2d 105, 112 (D.D.C. 2013) (quoting *Graham*, 490 U.S. at 396); *see also Wolfe v. Dep't of Homeland Sec*., No. 19-cv-5330, 2020 WL 7017861, at *1 (D.C. Cir. Sept. 17, 2020) (per curiam) (applying *Graham* factors to excessive force analysis in case brought under the FTCA). The "reasonableness" should be judged objectively, "from the viewpoint of a reasonable officer on the scene." *Armbruster*, 962 F. Supp. 2d at 112 (citing *Rogala v. Dist. of Columbia*, 161 F.3d 44, 54 (D.C. Cir. 1998)). "[T]he question is whether the officers' actions are 'objectively reasonable' in the light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. Further, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396–97. Accordingly, in an excessive force case "a defendant's motion for summary judgment is to be denied only when . . . a reasonable jury could conclude that the excessiveness of

10

the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions." *Harris*, 776 F.3d at 913 (alteration in original) (quoting *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993)).

Even so, courts generally deny motions for summary judgment when there is a genuine dispute of fact as to whether law enforcement used force against a subdued subject. *See, e.g.*, *Johnson v. District of Columbia*, 528 F.3d 969, 974, 977 (D.C. Cir. 2008) (finding the government not entitled to summary judgment when there was a genuine issue of material fact as to whether the plaintiff took a "submissive" position and submitted to arrest before he was kicked in the groin by a law enforcement officer); *Johnson v. District of Columbia*, 490 F. Supp. 3d 144, 164 (D.D.C. 2020) (noting "the reasonableness of [the officer's] strikes will turn on the very question of whether [the plaintiff] was subdued before the strikes, or, conversely, whether he was actively resisting [the officer]"); *Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 64–65 (D.D.C. 2018) (noting that a jury could "[o]bviously" find that "officers beat[ing the plaintiff] for no reason as he lay subdued on the ground, trying to shield himself from the blows" could constitute excessive force).

### A.    Pannell does not argue that deputies used excessive force prior to him being subdued or that the Taser deployments were excessive.  As such, the undersigned recommends that the Court find that Pannell has forfeited these arguments.

Pannell rests his entire opposition on the argument that an issue of material fact exists as to whether excessive force was used *after* he was handcuffed and subdued.  *See* ECF No. 41-1 at 11 (arguing that parties have "differing accounts of the interaction" and "[t]he dispute as to whether the [deputies] used force against Mr. Pannell after he was subdued and handcuff[ed] is material to the outcome of the case.").  Specifically, Pannell argues that the deputies used unreasonable force against him when they "continued to strike [him] as he lay on the ground handcuffed and subdued." *Id.* at 8; *see also id.* ("[T]he [deputies'] use of force against Mr. Pannell when he was in a prone

11

position on the ground and in handcuffs was unreasonable[.]"); *id.* at 9–10 ("Once the [deputies] handcuffed Mr. Pannell, he was subdued and no longer posed a threat to [them] nor did he pose a threat to escape the [deputies], rendering any further use of force by them unnecessary.").  But Pannell does not argue that the deputies used excessive force *before* he was subdued, and notably does not challenge the deputies' use of Tasers to subdue him; rather, he challenges only the use of "strike[s]."  *See id.* at 8, 11.

Omitting such argument narrows the issues for the Court.  "It is well understood in this Circuit that when a plaintiff files an opposition addressing only certain arguments raised by the defendant, 'a court may treat those arguments that the plaintiff failed to address as conceded.'" *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997)); *see also, e.g.*, *Saleh v. Mayorkas*, No. 23-cv-409, 2024 WL 3400261, at *3 (D.D.C. July 12, 2024) (treating an argument raised in the defendant's dispositive motion as conceded where the plaintiff "opted not to respond to [the] argument"); *Williams v. Savage*, 569 F. Supp. 2d 99, 107 (D.D.C. 2008) (finding that, where plaintiffs "demonstrate[d] that they knew of their right to respond to the defendants' arguments" by filing an opposition to a dispositive motion but "chose not to" address those arguments, "[i]t is a concession of the point").  Such a rule is consistent with the "principle of party presentation," by which courts "rely on the parties to frame the issues for decision" and assume that "the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1109 (D.C. Cir. 2019) (quoting *Greenlaw v. United States*, 554 U.S. 237, 244 (2008)).  As such, the undersigned recommends that the Court find that Plaintiff has conceded any excessive force argument as to actions taken by law

enforcement before he was subdued and that the actions taken by the deputies prior to handcuffing him, including the deputies' use of the Tasers, were reasonable under the circumstances.

As Defendant aptly observes[9] it is not entirely clear the exact moment when Pannell was subdued. But based on the record, Pannell was clearly evading arrest prior to the first Taser deployment—Pannell admitted in his deposition that he attempted to flee after his exchange with the deputies in the stairwell. *See* ECF No. 41-4 at 18 (Pannell testifying that he "felt as though it was some type of law enforcement" when he "ran from the stairwell"); *id.* at 19 (Pannell testifying that he fled the stairwell because he was "scared and didn't want to go to jail"). Further, it is uncontested that Deputy Messinger deployed the first Taser to stop Pannell from fleeing. *See* ECF No. 40-1, ¶¶ 33–35; ECF No. 41-3, ¶¶ 33–35 (Pannell admitting that the deputies told him to "stop," but he "kept running," and as he ran away Deputy Messinger deployed a Taser at Pannell's back). As such, and because Pannell failed to argue that any Taser deployment constituted excessive force, *see* ECF No. 41-1 at 8, 9, the undersigned finds that it is uncontested that Pannell was not subdued prior to the first Taser deployment. Further, based on Pannell's failure to argue that the second Taser deployment constituted excessive force, *see* ECF No. 41-1 at 8, 9, and his admission that the second Taser was deployed to "gain control of [his] arm to place [his] second wrist in handcuffs," *see* ECF No. 40-1, ¶ 57; ECF No. 41-3, ¶ 57, the undersigned finds that it is uncontested that Pannell was not subdued prior to the second Taser deployment. As such, the only material issues that remain are whether Pannell was subdued after the second Taser was deployed and

---

[9] Defendant argues that Pannell's failure to identify when he was subdued is one of the reasons its motion for summary judgment should be granted. *See* ECF No. 43 at 4–5. This argument only highlights that there are facts at issue as to the moment Plaintiff was subdued and whether the deputies continued to strike him after that moment. As discussed above, the undersigned finds that Plaintiff has conceded the argument that he was subdued prior to the second Taser deployment, but there are facts at issue regarding the exact moment Plaintiff was subdued and whether the deputies continued to strike him after that time. As discussed in the next section, this issue is material to the deputies' use of force under the circumstances.

he was handcuffed, and whether the officers continued to strike him during that time.  As explained in detail below, that material factual disputes exist as to these issues.

**B.    An issue of fact exists as to whether the deputies used excessive force after Pannell was subdued.  As such, the Court should deny Defendant's motion for summary judgment.**

As noted, several courts have held that a finder of fact could determine it objectively unreasonable for law enforcement to keep striking an already subdued subject.  *See, e.g.*, *Johnson*, 528 F.3d at 974, 977; *Johnson*, 490 F. Supp. 3d at 165; *Jackson*, 327 F. Supp. 3d at 64–65.  This conclusion is based on a factually intensive analysis, with particular consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  Courts have found that once a suspect is subdued, he no longer poses an immediate threat to the safety of the officers or others and is no longer actively resisting arrest. *See, e.g.*, *Williams v. District of Columbia*, 268 F. Supp. 3d 178, 190–91 (noting that the plaintiff's claims that he was subdued when the officers were attempting to handcuff him, "if true, . . . would suggest [he] was no longer actively resisting arrest, was not a flight risk, and did not pose a threat to the [o]fficers or others").  In other words, a reasonable jury could conclude that "excessiveness of force" used in striking a subdued subject "is so apparent that no reasonable officer could have believed in the lawfulness of his actions."  *See Harris,* 776 F.3d at 913 (quoting *Wardlaw*, 1 F.3d at 1303); *see also Williams*, 268 F. Supp. 3d at 191 ("[I]f a jury were to credit [the plaintiff's] account that he was prone, subdued, and not resisting, it would be unreasonable to repeatedly hit his head and smash it into the ground in order to secure him in handcuffs.").

Here, although Pannell concedes that he was resisting arrest at first, *see* ECF No. 40-1, ¶¶ 33–36; ECF No. 41-3, ¶¶ 33–36, and acknowledges that the deputies had a qualified privilege to use reasonable force to effect his arrest, *see* ECF No. 41-1 at 8; *see Harris*, 776 F.3d at 913, he

argues that the deputies continued to strike and kick him after he was subdued.  ECF No. 41-1 at 8.  This, he argues, was excessive.  *Id.*  Or, at least, he contends that his and the deputies' "differing accounts" create a material issue of fact "as to whether the Marshals used force against [him] after he was subdued and handcuff[ed]."  *Id.* at 11.

Plaintiff points to his personal account of events, in both his deposition and in response to interrogatories, to support the fact that he was repeatedly struck by deputies after he was subdued and handcuffed.  *See* ECF No. 41-1 at 6.  Specifically, Pannell testified that he "felt a shock in [his] testicles" and that when he felt the shock, "instantly [his] arm came back."[10]  ECF No. 41-4 at 20. He further testified that he "was still getting assaulted" as he "was cuffed."  *See* ECF No. 43 at 2 (citing Pannell Deposition 44:25–45:21).  Later in Pannell's deposition, in response to another line of questioning about the second Taser deployment, he testified:  "That's when my arm came back and they put me in cuffs.  I was still being punched.  And that's when the ambulance approached, came."  *See* ECF No. 40-2 at 33.  Additionally, in Pannell's response to interrogatories, he described the chain of events as follows:

> As I got to the end of the alley, I felt a shock and fell to the ground.  Once I was on the ground, I felt multiple individuals on top of me.  I was kicked and punched while face down on the ground.  As I lay on the ground, I felt another shock[.] . . . I was placed in handcuffs after which *I was again struck in my face, ribs and back*.

ECF No. 41-5 at 3 (emphasis added).

Taking this evidence in the light most favorable to Plaintiff, the nonmoving party, and drawing all reasonable inferences in his favor, *Grosdidier*, 709 F.3d at 23–24, the relevant factors suggest that a reasonable finder of fact could determine that the deputies' use of force was

---

[10] Although both parties cite page 44 through 45 of Plaintiff's deposition testimony, neither provided the Court with page 45 of his deposition in their exhibits.  *See* ECF No. 40-2 at 31–32 (omitting pages 44–45 of Plaintiff's deposition transcript); ECF No. 41-4 at 20–21 (omitting pages 45–46 of Plaintiff's deposition transcript).  Nonetheless, Defendant states in its Reply that Plaintiff testified that he "was still getting assaulted" as he "was cuffed" in response to the second Taser shock.  ECF No. 43 at 2.

unreasonable, if Plaintiff's version of events are believed. *See Harris*, 776 F.3d at 913. That said, the first *Graham* factor—the severity of the crime—weighs in favor of the deputies. Plaintiff was wanted on assault with a deadly weapon (gun), a felony offense. *See* ECF No. 40-1 at 1; ECF No. 41-3 at 1. Further, the deputies were told that he could be armed because the gun involved in the underlying assault charge had not been recovered. *See* ECF No. 40-1, ¶ 1. Although multiple deputies testified that they never actually saw a gun on Plaintiff during his arrest, *see* ECF No. 40-2 at 47, 93, the severity of the crime for which he was being arrested, together with the possibility that he possessed a gun at the time of his arrest, weigh in favor of the deputies' use of force to effectuate his arrest. *See Armbruster*, 962 F. Supp. 2d at 112 (noting that "[i]n determining whether an officer's use of force was reasonable," the court should consider the severity of the alleged crime and whether the suspect posed an immediate threat); *Cotton v. District of Columbia*, 541 F. Supp. 2d 195, 204 (D.D.C. 2008) (finding force reasonable to subdue an individual when she was suspected to be involved in an "altercation involving a knife" and, under the circumstances, it was reasonable for the officer to believe she "may [have been] armed"). But Plaintiff claims at the time he was struck that he was subdued, pinned to the ground, and handcuffed. If believed, a jury could certainly find that the last two *Graham* factors—whether Plaintiff posed an immediate threat to officers or others or was attempting to evade arrest, *see Graham*, 490 U.S. at 396—weigh in his favor. Or in other words, if a jury were to credit Plaintiff's account of events, it could find that use of force was unreasonable. *See Harris*, 776 F.3d at 913 ("[A] defendant's motion for summary judgment is to be denied . . . when . . . a reasonable jury could conclude that the excessiveness of the force [was] so apparent that no reasonable officer could have believed in the lawfulness of his actions." (second alteration in original) (quoting *Wardlaw*, 1 F.3d at 1303)). As such, summary judgment should be denied.

16

Seeking to avoid that result, Defendant presents a number of arguments as to why Plaintiff's evidentiary proffer is insufficient to create a genuine factual dispute. Each are considered below.

Defendant's first argument—that the evidence Plaintiff cites establishes only that the deputies struck Pannell before the second Taser was deployed, when he was not yet subdued, and therefore these strikes cannot be considered unreasonable force, ECF No. 43 at 2–3—is misplaced in light of the record laid out above. Defendant's recitation does not accurately describe the evidence relied on by Plaintiff. Instead, as explained above, when looking at both his answers to interrogatories and deposition testimony, and reading all factual inferences in his favor, a jury could find that the deputies struck Plaintiff after he was subdued. And, if so, a jury could find that that use of force was excessive. *See, e.g.*, *Johnson*, 490 F. Supp. 3d at 165; *Jackson*, 327 F. Supp. 3d at 64–65.

Next, Defendant notes that "[s]ignificantly, Pannell does not argue that either of the two Taser deployments was an unreasonable use of force." ECF No. 43 at 3. Defendant contends this is significant because it forecloses the possibility that the "punches" or "strikes" that occurred "at the same time" as the Taser strikes were excessive. *Id.* For the same reason the previous argument does not work, this argument also fails. Pannell has not argued that the strikes used to subdue or handcuff him were unreasonable, but rather that deputies continued to strike him after he was subdued and handcuffed and that those strikes were excessive. *See* ECF No. 41-1 at 11. He supports this argument with his deposition testimony and interrogatory responses which can be reasonably understood to state that he was struck multiple times by the deputies after he was placed in handcuffs. As explained above, this factual proffer is sufficient to raise a material issue that must be resolved by the jury.

Case 1:20-cv-00518-CKK-GMH    Document 45    Filed 06/25/25    Page 18 of 25

Defendant also takes issue with Plaintiff's interrogatory response in which he explained the chronology of his arrest in detail and stated that "[he] was placed in handcuffs after which [he] was again struck in [his] face, ribs, and back." ECF No. 41-5 at 3. Specifically, Defendant objects this response because it is "devoid of any additional information." ECF No. 43 at 3–4. Defendant does not elaborate on this argument or cite any supporting case law to establish why an interrogatory response would require "additional information" for a court to rely on it in a motion for summary judgment. In fact, Rule 56 of the Federal Rules of Civil Procedure explicitly lists "interrogatory answers" as a type of evidence that may be used to support an asserted fact. Fed. R. Civ. P. 56(c)(1)(A). Nor does Defendant cite any case law forbidding the use of self-serving interrogatory answers based on personal knowledge, which Plaintiff's obviously are. And it could not. In this Circuit, a court may rely on such testimony in its consideration of whether to grant summary judgment. *See, e.g.*, *Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 374–75 (D.C. Cir. 2020) (stating that assertions setting out admissible facts in "self-serving affidavits," unless conclusory or made without personal knowledge, must be considered on summary judgment). Defendant's argument ignores the clarity of Plaintiff's interrogatory response that he was "again struck in [his] face, ribs and back" after he was placed in handcuffs and argues that he is likely referring to the time between when the deputies placed the first handcuff on his right wrist and before they had secured the second handcuff. *See* ECF No. 43 at 3–4. Because Plaintiff does not dispute that the deputies used excessive force before the second Taser was deployed and it is undisputed that Plaintiff was placed in handcuffs directly thereafter, Defendant argues that the interrogatory response fails to create a disputed material fact. *See id.* at 4. But that is not what Plaintiff's interrogatory response says. More, as the non-moving party, the Court must draw all reasonable inferences in his favor. *Grosdidier*, 709 F.3d at 23–24. The undersigned cannot simply infer that he meant something

different than what he said when such an inference would undoubtably be in Defendant's favor. As such, the Court assumes that Pannell meant what he said—that the deputies continued to strike him after he was handcuffed and subdued.  It is for the jury to decide whether his version of events is to be believed.  *Barnett*, 715 F.3d at 358 (noting that credibility determinations are beyond the scope of a court deciding a motion for summary judgment).

Next, Defendant attempts to distinguish the cases Plaintiff cites in opposition to summary judgment.  *See* ECF No. 43 at 4.  Unlike in *Johnson v. District of Columbia,* Defendant argues that Plaintiff cannot survive summary judgment because he has not identified when he was actually subdued.  *See* ECF No. 43 at 4 (citing *Johnson*, 528 F.3d 969).  The evidence in *Johnson* suggested that, before the plaintiff was kicked in the groin by an officer attempting to effect his arrest, he "raised his hand, turned toward the open door of his apartment, fell face-first to the floor, and spread his arms and legs in a manner announcing submission." *Johnson*, 528 F.3d at 974.  There, the court took all factual inferences in the plaintiff's favor, "accept[ed] [the plaintiff's] allegation that he meant to surrender peacefully," and assumed "that [he] acted in a submissive fashion." *Id*. As such, the court was "convinced that a reasonable officer would not have repeatedly kicked the surrendering suspect in the groin" and a jury could find that such force was excessive under the circumstances.  *Id.*  In contrast, Defendant argues that Pannell has not presented evidence that he was acting in a similarly submissive fashion and was therefore not subdued before the strikes that form the basis for his complaint.  To the contrary, Defendant emphasizes that Plaintiff seemingly concedes that he was not subdued before both his hands were placed in handcuffs.  *See* ECF No. 41-1 at 6, 8, 9.  But that is only one way of viewing the evidence.  There is also record evidence suggesting that Plaintiff may have been subdued prior to that point.   He testified in his deposition that he did not resist arrest from the moment he was brought to the ground, but instead could not

comply with the deputies' commands to provide his hands for arrest because the deputies were pinning him to the ground. *See, e.g.*, ECF No. 41-4 at 20 (Pannell testifying that after the deputies put the first handcuff on "[they were] constantly telling me to put my hand behind my back . . . [b]ut I [couldn't] . . . because all the pressure from them being on my back, one person was on my back and them punching and kicking me, my arm [couldn't] move"); *id.* at 23 (Pannell testifying that it was "not true" that he "refused to present [his] hands so that [he] could be hand-cuffed"); *id.* (Pannell testifying that he "couldn't move" in response to whether he tried to get back up after the first Taser was deployed); *id.* ("[O]ne hand was in the cuff, behind my back, my other, left hand was pinned in front of me, straight out . . . ."). This contrasts with the deputies' deposition testimony stating that Pannell persistently sought to evade arrest even after he was brought to the ground, that he kept trying to get up, and that he pulled his left arm under his body to impede the deputies' attempts to place him in handcuffs. *See* ECF No. 40-2 at 102 (Messinger testifying that "[Pannell] was not allowing [the deputies] to have access to his hands to put handcuffs on him" and was "kicking his legs," and that the deputies were "trying to get his hands out from under [him]"); *id.* at 47 (Hale testifying that Pannell pulled his hands "under his stomach area"); *id.* at 122–23 (Ward testifying that Pannell "struck [him] in the face" as soon as he fell to the ground, then pulled his hands under his "chest/stomach area," and "was still fighting" as the deputies tried to "free[] his arms"). As in *Johnson*, the Court may not take sides in that dispute. The conflicting testimony highlights that a material issue of fact exists as to whether Plaintiff was acting submissive and at what point he was subdued. The jury should decide those issues at trial.

Next, Defendant argues that this case is distinguishable from *Jackson v. District of Columbia*, because Pannell has not identified any *specific* Deputy that struck him after he was subdued. *See* ECF No. 43 at 4 (citing *Jackson*, 327 F. Supp. 3d at 64–65). In *Jackson*, the plaintiff struck a

moped while driving drunk. 327 F. Supp. 3d at 57. After leaving the scene of the accident, the plaintiff was pulled over by police and resisted arrest, which led to a physical altercation between him and the officers. *Id.* In resolving a motion for summary judgment, the court found it relevant that the plaintiff could identify the specific officers that participated in the use of excessive force against him. *Id.* at 65–69. But, there, the excessive force claims were brought against the officers individually and multiple officers argued that they did not participate in the alleged use of excessive force at all. *Id.* at 68. Here, the FTCA claim is brought against the United States in a representative capacity and Defendant has not argued at any point that the deputies in question were not involved in the alleged use of excessive force. In fact, the deputies concede that they struck Pannell—although there is a factual dispute regarding *when* they delivered their strikes. *See* ECF No. 40-1, ¶¶ 43, 46, 47 (Defendant admitting that Deputies Ward, Shindledecker, and Hale struck Pannell during the tussle on the ground). Additionally, it is unsurprising that Plaintiff was unable to identify exactly which deputies struck him after he was handcuffed. Based on both his and the deputies' testimonies there were approximately four deputies physically engaged in bringing him to the ground and placing him in handcuffs. *See id.*, ¶¶ 43–51 (admitting that Deputies Ward, Hale, Messinger, and Shindledecker were involved in the fight on the ground); ECF No. 41-4 at 21 (Pannell testifying: "[As] soon as I go down to the ground, I felt several people run down on me, and I felt . . . punching, kicking"). Further, even the deputies admit that they did not know exactly what was happening during the melee on the ground. *See* ECF No. 40-2 at 73 (Shindledecker testifying, "I don't recall exactly what happened during us grappling on the ground. There [were] definitely strikes being thrown . . . ."); *id.* at 121–22 (Ward testifying that the final tussle was "constantly moving and evolving, so there was really no one in the same position on one side or both sides"). And it is uncontested that Plaintiff was on his stomach for the majority of the incident. *See* ECF

No. 40-1, ¶¶ 44–49; ECF No. 41-4 at 21 (Pannell testifying that when he was on the ground he was on his stomach with his "right arm cuffed behind [his] back" and his "other arm [] pinned forward"). Given the standard to recover under the FTCA, it is not clear why Plaintiff would be required to identify which *specific* deputy or deputies continued to strike him after he was subdued. *See* 28 U.S.C. § 1346(b)(1) (creating a cause of action against the United States to recover money damages caused by a "wrongful act . . . of any employee of the Government while acting within the scope of his employment"); *cf. Johnson v. Veterans Affs. Med. Ctr.*, 133 F. Supp. 3d 10, 12, 16–17 (D.D.C. 2015) (noting that the United States would be the proper defendant in an FTCA case brought against "unnamed [federal] employees"). Defendant does not contest that the deputies involved were employees of the government acting within their scope of employment at the time of Plaintiff's arrest. Nor does Defendant argue that Plaintiff's injuries were caused by some other non-governmental actor. Drawing all reasonable inferences in Plaintiff's favor, the undersigned finds that his inability to identify exactly which deputy allegedly punched or kicked him after he was subdued does not warrant summary judgment in Defendant's favor—if a jury determines any one of the deputies exerted excessive force, Defendant will be liable.

Additionally, Defendant argues that Pannell fails to establish what "particular form of excessive force was applied [and] for [what] amount of time," which distinguishes this case from *Ingram v. Shipman-Meyer*. ECF No. 43 at 5 (citing *Ingram v. Shopman-Meyer,* 241 F. Supp. 3d 124 (D.D.C. 2017)). In *Ingram*, the plaintiff provided evidence that the officer applied a chokehold, a form of lethal force for at least 20 to 30 seconds. *See id.* at 134–5, 140–41. The court there found that when an officer uses a chokehold, there is not "a single decision point"; instead "[o]nce applied, the officer retains the ability to release the hold." *Id.* at 140. The length of time the officer applied the chokehold was relevant to the question of excessive force because, "in the context of

a chokehold case, the analysis of whether an officer acted reasonably focuses not only on the decision to apply the hold in the first instance but also on the officer's continued application of the hold." *Id.* The situation here is not analogous; rather, Plaintiff has clearly identified "strikes" after he was subdued as the form of excessive force, which is supported by his deposition testimony and interrogatory response. *See* ECF No. 40-2 at 33 (Pannell deposition testimony); ECF No. 41-5 at 3 (Pannell interrogatory response). As discussed above, this evidence is sufficient to defeat summary judgment. *See* Fed. R. Civ. P. 56(c)(1)(A).

Finally, Defendant argues that Pannell cannot tie any physical injury to the application of force after he was subdued. *See* ECF No. 43 at 5. Specifically, Defendant contends the record does not support that any "punching and kicking" after he was subdued resulted in any of his serious injuries. *Id.* To support this, Defendant provided—as an exhibit to its reply—the deposition of the attending physician at Howard University Hospital, Dr. Morayo Fakiya, who treated Pannell. *See id.* (citing ECF No. 43-1 (Fakiya deposition)). Defendant notes that Dr. Fakiya testified that "'the reason why [Pannell] was admitted to the hospital' was [because] he had elevated creatine phosphokinase (or CPK) in his blood, which impacted his kidney function." *Id.* (alteration in original) (quoting ECF No. 43-1 at 18); *see also* ECF No. 43-1 at 16 (describing Pannell's injury as an "acute kidney injury secondary to the elevated CPK and/or dehydration"). Defendant notes that Dr. Fakiya testified that high CPK levels can be caused by "strenuous exercise" or "dehydration." *Id.* at 5 (citing ECF No. 43-1 at 10–12, 14–15). She also testified that there was a note in Pannell's hospital records that the elevated CPK levels may have been caused by the Taser. *See* ECF No. 43-1 at 12–14. Based on this testimony, Defendant argues that Plaintiff cannot establish that any "significant injury" resulted from the strikes after he was subdued. But Plaintiff has testified that he had numerous injuries following his arrest, including the kidney injury. *See* ECF No.

41-4 at 31–32 (Pannell testifying that he had a fractured cornea, blurred vision, kidney problems, testicle problems, backaches, and back problems).  That Defendant has provided evidence that Pannell was admitted to the hospital because of his elevated CPK levels does not necessarily discount the other injuries he has testified to.  *See id.*  Stated differently, whether he was admitted to the hospital for elevated CPK levels is factually distinct from whether his other alleged injuries were caused by the deputies' use of force.  To the extent Dr. Fakiya's testimony can be interpreted as contradicting Plaintiff's testimony concerning his injuries—and it is not clear that it does—the "truth of the matter" is a credibility determination that should be left to the jury.[11]  *See Barnett*, 715 F.3d at 358.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** the Court **DENY** Defendant's Motion for Summary Judgment.  Fact issues exist as to (1) the point at which Plaintiff was subdued; and (2) whether the deputies punched and kicked him after he was subdued.  These issues are material to whether the deputies used excessive force against him in effecting his arrest and should be decided by a jury.

*        *        *        *        *

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of

---

[11] Similarly unavailing is Defendant's assertion that Plaintiff's statement that he "suffered a fractured cornea" is not supported by the record.  *See* ECF No. 43 at 6.  Plaintiff testified that, as a result of his arrest, he suffered a "fractured cornea" and experienced "blurred vision, [and] elevated pressure, like a thumping feeling in [his] eye."  ECF No. 41-4 at 31.  More, Defendant acknowledges a head CT scan was performed at the hospital, which identified "an indeterminate[] left medial orbital wall fracture."  ECF No. 43 at 6.  Dr. Fakiya, in her deposition, explained that the radiologist, at the time, was "not able to determine how old the fracture was, if it was a new fracture or maybe an old fracture."  *Id.* at 19–20.  Assuming Dr. Fakiya's testimony about the CT report is admissible, it may support that Plaintiff had an eye injury at the time he was brought to the hospital, and a reasonable jury could find based on it, the CT scan, and Plaintiff's testimony, that such an injury was caused by the deputies' use of force.

the party's receipt of this Report and Recommendation.  The written objection must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections.  The parties are further advised that failure to file timely objection to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendations.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date: June 25, 2025

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE